IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 29, 2025

## STATE OF TENNESSEE v. JONATHAN MAINE LOWE

**Appeal from the Criminal Court for Scott County**
**No. 11799    Zachary R. Walden, Judge**

———————————

### No.  E2025-00140-CCA-R3-CD

———————————

The Defendant, Jonathan Maine Lowe, appeals his convictions for five counts of aggravated sexual battery, one count of rape of a child, one count of rape, two counts of incest, and two counts of child abuse or neglect, for which he received an effective eighty-year sentence in confinement.  On appeal, he argues that the trial court erred by: (1) denying his motion to suppress statements made at the Department of Children's Services ("DCS") office because such statements were elicited pursuant to a custodial interrogation prior to his being given *Miranda* warnings; (2) improperly commenting on the evidence by incorporating the State's bill of particulars into its jury instructions as part of the State's election of offenses; and (3) relative to his convictions for child abuse or neglect, providing an incorrect statement of law by giving a jury instruction for "child neglect" rather than for "child abuse."  Additionally, the Defendant contends that the evidence is insufficient to support his convictions for child abuse, or in the alternative, child neglect.  After review, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

KYLE A. HIXSON, J., delivered the opinion of the court, in which JILL BARTEE AYERS and TOM GREENHOLTZ, JJ., joined.

Jeffrey C. Coller and Travis E. Dorman (on appeal and at motion for new trial), and Joseph A. Fanduzz (at trial and sentencing), Knoxville, Tennessee, for the appellant, Jonathan Maine Lowe.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin L. Barker, Assistant Attorney General; Jared R. Effler, District Attorney General; and Apryl C. Bradshaw and David M. Pollard, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I. FACTUAL AND PROCEDURAL HISTORY

This case arises from the Defendant's perpetrating a number of sexual offenses against his minor stepdaughter, A.G.,[1] between fall 2010 and October of 2020. From these incidents, a Scott County grand jury returned an eleven-count indictment against the Defendant, charging him with aggravated sexual battery (counts 1, 2, 5, 6, and 7), rape of a child (count 3), incest (counts 4 and 9), rape (count 8), and sexual battery by an authority figure (counts 10 and 11).[2] *See* Tenn. Code Ann. §§ 39-13-503, -504(a)(4), -522, -527; -15-302.

### A. Motion to Suppress

Prior to trial, the Defendant filed a motion to suppress his statements made during an interview with DCS, alleging these statements were elicited pursuant to a custodial interrogation prior to his being *Mirandized*.[3] On February 20, 2023, the trial court heard the Defendant's motion. Delilah Miller, an investigator with DCS, testified that on Saturday, November 20, 2020, she was assigned to the victim's case, when the victim was around fifteen years old. Ms. Miller acknowledged that she interviewed the Defendant that same evening and explained that the interview was conducted at this time rather than on a weekday during business hours because the victim was scheduled to return that evening to the household where the Defendant resided. As such, Ms. Miller needed to assess whether an immediate protection agreement was needed. The purpose of the interview was to "just get a feel for what was going on, if he had any knowledge of the report . . . to find out if he could give me any information . . . anywhere from saying yes, he did it[,] to just corroborating information." She acknowledged that earlier that day, she had been in contact with the sheriff's detective who generally handled child abuse cases and with the assistant district attorney as part of a Child Protective Investigative Team.

When Ms. Miller called the Defendant that afternoon, she introduced herself and asked whether he was available to come into the office and speak with her. Ms. Miller did not identify herself as law enforcement nor did she inform the Defendant that he was

---

[1] It is the policy of this court to refer to victims of sexual crimes by their initials.

[2] Counts 10 and 11 were subsequently reduced to the offense of child abuse or neglect, which we will detail later in this opinion.

[3] *See Miranda v. Arizona*, 384 U.S. 436, 458, 479 (1966).

required to meet with her. The Defendant agreed to a meeting that evening and drove himself to the DCS office. As it was Saturday evening, the DCS office was closed. Following DCS protocol, Ms. Miller requested the presence of a law enforcement officer as a safety precaution because she was "alone and it was after hours." While she requested only one officer, both Sergeant Danny Phillips and Sergeant Michelle Sexton of the Scott County Sheriff's Office ("SCSO") responded.

When the Defendant arrived, Ms. Miller let the Defendant into the locked building. However, she explained that the Defendant could leave the building at any time because the doors opened for anyone attempting to exit the building. Ms. Miller led the Defendant to a conference room that seated around twelve people. She and the Defendant sat at a table facing each other; her back was to the door, and the Defendant was facing the door. Both officers sat "off to the side kind of in the corner sitting next to each other." Ms. Miller could not recall whether the door to the conference room was open but agreed that the Defendant would have had to walk around her and the officers to exit the room. She also confirmed that she did not place any limitations on the Defendant's movements during the interview. Unbeknownst to Ms. Miller, Sgt. Phillips started recording the interview on his cell phone. The relevant portion of the interview on the recording was approximately twenty-six minutes in duration and was entered as an exhibit.

At the beginning of the recording, Ms. Miller asked whether the victim had a reason to make an allegation of child abuse against the Defendant. The Defendant acknowledged that he and the victim had "a couple of issues." When asked to give details, the Defendant responded, "I guess the easiest way to put it, I've bothered her a couple times before. . . . I've touched her down there before on you know." He then explained that he "black[s] out" for days and is unaware of his actions. Ms. Miller sought to clarify whether the victim had a reason to make an allegation against the Defendant, to which he answered, "Yes, ma'am." Ms. Miller again asked the Defendant to explain, and he said the victim would "bother" or "wrestl[e]" with him on the couch and that he had "touched her a few times" during these interactions. When asked when this started, he said, "[I]t's been for a couple years . . . on and off[.]" Ms. Miller stated, "[Y]ou said you touched her down there[,]" and the Defendant responded, "Yes. . . . [I]t was like I said, I don't know what I was doing so I don't know." Ms. Miller commented that the Defendant must "at least remember some" specifics because he knew he had touched the victim. The Defendant agreed saying, "Yeah 'cause . . . like I said, we tried to deal with it and move on, and you know what I mean?" When asked to clarify, the Defendant said, "Me and my wife talked to her, and I told her that I would go get help and everything and I have been going and getting help and I need to pursue that help further."

The Defendant reported that the last incident occurred six months to one year ago. When Ms. Miller stated that the victim had reported the last incident happening a few weeks ago, the Defendant denied it saying he knew "better than that." He said that the victim could have been referring to when the two were "wrestling on the couch" and the victim "had her head up on [him] and . . . her butt up on [him] and stuff and [he was] trying to push her off." When asked whether the victim had ever flirted with him, the Defendant stated,

> There's been a time or two she's . . . not really flirted but she . . . always runs around the house . . . hind end hung plum out and . . . I've tried to explain to her look you gotta stop this. . . . I sat there and explained to her I went to get help. I gotta have help. You can't be doing all this stuff. . . . I love my wife. I love my kids, and like I said, I know I screwed up and I'm trying . . . . I've gotta get help. I'm on medicine, and I'm trying to take care of all of it[.]

When asked whether the Defendant's DNA would be on the victim's underwear, bedding, or clothing, he said that it would not but added that the children leave their clothes on the bathroom floor and that he moves the clothing. When Ms. Miller clarified that she meant DNA as in semen, the Defendant responded, "Oh no. Lord, no. . . . No, it's never been like that."

The Defendant reported that he "love[d] [the victim] to death" and had no issue with her. He stated that the victim sometimes lied, but it was "just normal kid stuff," and he could not recall the victim's making up "wild tales." He confirmed the family had a four-wheeler and a "side-by-side" ranger but that he and the victim had not gone riding together in "a long time." The Defendant continued that he had PTSD from his time in the military, was now on medication, had started going to church, and was trying "to get [his] mind back[.]" He repeated several times that he was being honest with Ms. Miller and did not want his wife and children involved in this investigation. He additionally mentioned that he had been an army mechanic, had hurt his back and knee, and had worked with the Veterans Affairs Department to "get help." He informed Ms. Miller that he was on blood pressure medication, Gabapentin, muscle relaxers, and nerve medication. At times during the interview, Ms. Miller would apologize when taking time to notate what the Defendant said or when she asked "graphic" questions, to which the Defendant responded, "Oh, you're fine." When Ms. Miller asked the Defendant to wait while she looked for a clipboard, she apologized stating she was usually more organized, to which the Defendant responded, "It's fine, didn't even have to be here."

Ms. Miller stepped out of the interview room, called the assistant district attorney, and informed the assistant district attorney that the Defendant had confessed and that she would ask the Defendant to provide a written statement. The assistant district attorney told Ms. Miller that the Defendant needed to be *Mirandized*. Ms. Miller stated that the officers were "not happy" about having to *Mirandize* the Defendant because they were not investigating the matter. Nonetheless, the Defendant was *Mirandized* and was put in a separate room alone to write a statement.

Sgt. Phillips worked as a patrol shift sergeant for the SCSO and on November 20, 2020, was asked to assist DCS by providing protection for one of its workers. He confirmed that he had a firearm with him that evening and was in uniform. Although present in the room, he did not actively participate in the Defendant's questioning that night and explained that he turned on his cell phone recorder as a "precautionary" measure because, in his experience, "sometimes things get said that could be later used." When he learned that the assistant district attorney wanted the Defendant *Mirandized*, he was not "really happy about that" because the Defendant was not under arrest, and he and Sgt. Sexton were present for safety reasons only. He noted that neither he nor Sgt. Sexton had a copy of the *Miranda* rights on their person that evening, and they had to retrieve a copy of the rights from one of their patrol vehicles. He also stated that he did not investigate this case and had not been involved other than being subpoenaed for this hearing.

Sgt. Sexton worked as a patrol sergeant with the SCSO and, while on patrol on November 20, 2020, was asked to provide a security presence at DCS. She noted this was "pretty common." She confirmed she was in uniform and had a firearm and handcuffs that evening. She did not know the Defendant and stated that she did not participate in the interview that evening, other than being present. When law enforcement was asked to get involved by advising the Defendant of his *Miranda* rights, she was uncomfortable because she was not there in an investigative capacity.

Following the hearing, the trial court found that the Defendant was not in custody at the time of the interview. The trial court noted that *Miranda* requirements are triggered by a custodial interrogation, and the custody prong of this analysis is established when a reasonable person believes he or she is not free to leave. Analyzing the factors relevant to the custody inquiry, the trial court found that the location weighed against custody because the interview took place at the DCS office and not at a police station, sheriff's office, or jail. The time weighed slightly in favor of custody because Saturday night was "unusual," would "heighten anyone['s]" senses, and law enforcement would not have been needed if the interview had been conducted during regular business hours. The method of transportation weighed against custody because the Defendant voluntarily drove himself

to the DCS office with no expectation that he would be arrested. He was asked to come only if he was available, and the phone call was not coercive. As to the duration and character of questioning, both weighed against custody. The duration of the interview was brief as the Defendant began discussing the abuse only seconds after being asked whether the victim would accuse him of child abuse. The character of questioning was not unduly coercive to the point that the Defendant would feel unable to leave, and there was no limitation on the Defendant's movement other than potentially a closed door that remained unlocked for someone exiting the building, which weighed "heavily" against custody. The tone and demeanor were both "very casual" during the recording. The Defendant was left alone at times and was not made to feel as though he had to stay at the DCS office. At one point, Ms. Miller asked the Defendant to wait for her to get a clipboard, which was a "far cry" from being told not to leave. The trial court mentioned that the Defendant's motive to participate in the interview appeared to be to keep his wife and kids from being questioned—"a willingness to fall on his sword rather than a compulsion by law enforcement."

The trial court noted that while law enforcement officers were present, it was significant that the officers were seated away from the table and were "quite disinterested" throughout the recording. While Sgt. Phillips turned on his cell phone recorder, he was never "truly" involved in the interview. The trial court noted there were no "real" interactions between the officers and the Defendant. As such, it was "pretty clear" the Defendant was not being detained nor was he under arrest, which weighed against a custodial interrogation. Lastly, the Defendant was not presented with any evidence of guilt and was only asked why the victim would accuse him of child abuse, which was "pretty weak" and even failed to specify a type of abuse. Based on weighing these factors, the trial court found that the totality of the circumstances showed the Defendant was not in custody at the time of the interview and denied the Defendant's motion to suppress his statements to DCS.

B.     Trial Proceedings

1.     The Proof at Trial

The Defendant proceeded to trial on April 11-12, 2023. The victim stated she was almost eighteen years old at the time of trial. She was five feet tall and agreed she had always been petite for her age. She stated that once she disclosed the abuse, she began going to therapy, which helped her understand "a lot more stuff." Before starting therapy, she was scared to talk to anyone about the abuse and had only occasionally tried reaching out to her mother. While in therapy, she began remembering more details of what had

happened. The victim was in therapy for nearly two years, going as often as once or twice a week at times but only once every two weeks at other times.

The victim relayed that, prior to her disclosure of the abuse, she lived in Scott County with her mother, three younger brothers, and the Defendant, her stepfather, whom she identified in the courtroom. The Defendant and the victim's mother started dating when the victim was around three years old and married when the victim was five years old. At first, the family lived with the Defendant's parents, later moving down the road into their own house. The Defendant was a father figure to her, was "sweet" in the beginning, and she and the Defendant would collect scrap metal and soda cans on the family's four-wheeler or ranger every day. However, "things" were not always good, and the Defendant sometimes got "really aggressive or stressed out" and "it" would get "really, really bad."

The victim stated that the sexual abuse began almost immediately upon the Defendant's entering into her life and that it lasted "for at least ten years[,]" taking place "[a]lmost every day[,]" often once the Defendant returned from work. The frequency of the abuse depended on whether the Defendant had a bad week at work and was aggressive, angry, or stressed. Fighting back was "pointless" and "made it worse" and last longer. When she let him do "what he needed to do," both she and her brothers would not get "hurt," and the Defendant would leave her alone until he was angry again.

While the abuse began when she was around three years old, it was only starting at age five that she could recall certain incidents in detail. She acknowledged that she struggled with recalling the details surrounding each incident because of the frequency in which the abuse occurred, but she had vivid memories about certain incidents due to their association with a specific day or because "something specific [was] going on."

The first incident that she could recall in detail happened in the fall of 2010 when she was around five years old. The victim knew it was autumn because of the leaves on the ground. The Defendant and the victim went to collect soda cans, riding in a red four-wheeler up a trail by their house and parking in a "little flat area." The Defendant removed her pants and used them to cover her face, which was "part of the ritual." The Defendant began touching her "all over," "rubbing up on [her] vagina . . . rubbing inside the lips of [her] vagina with his fingers." She knew the Defendant was using his hand because it was "really, really wet," "kind of callousy," and "rough." She felt "a lot of pressure," and it "hurt a lot[.]" The victim's head was "hanging off" the four-wheeler, and because her face was covered, she could not see anything. She told him to stop and tried to "get him off of [her.]" The Defendant said he "needed to wipe" the victim because she

- 7 -

"smelled like pee" and "just stunk." However, she never saw him bring any wipes with him on these types of rides. She did not tell anyone about this incident because the Defendant told her to keep it a secret. She trusted the Defendant, thought this was normal, and was embarrassed that she smelled. It was a "long time" before she understood what was happening and noted that there was "no physical way" the Defendant could have been wiping her for hygienic purposes. Around this time, she relapsed from being potty trained and had to be put back in diapers.

The victim next remembered that in 2013, when she was around seven years old, she and the Defendant were riding on the four-wheeler on the same trail. They stopped and went into the one of the buildings on the property that contained chicken feed, rakes, and other cleaning supplies. Upon exiting the building and going back onto the trail, the Defendant "laid [her] over the four-wheeler," tied her pants around her face, and restrained her hands. He then began "rubbing up on [her] vagina and touching [her.]" She again described it as "wet . . . callousy . . . and it hurt a lot." Around this time, the victim was learning at school about "good and bad touch[es]" and realized these incidents were "not the right thing for [the Defendant] to be doing to [her]." The victim told her stepmother about this incident, and her stepmother told the victim's mother. However, nothing happened, which made the victim feel like no one believed her. She kept the abuse to herself, and she asserted this was because she was not sure what else to do.

In 2016, the Defendant took the victim out on the ranger on the "dozer tracks." The victim described the dozer tracks as a trail located down the road from their house that went into the woods and was "a mudding trail down to the river . . . [where] you could fish." She and the Defendant often went on the dozer tracks to collect soda cans, which was what she and the Defendant were doing that day. During this incident, the Defendant laid the victim down on the ranger and her head was "bent up against the little seatbelt buckle that your seatbelt buckles into, and it really hurt [her] neck." He pulled her pants off, covered her face, and restrained her. As he held her arms down, the Defendant touched her vagina, "rubbing up on it, and he wouldn't leave [her] alone." The victim later told her mother about this incident while at a Long John Silver's restaurant and said that she never again wanted to be alone with the Defendant. Her mother called the Defendant, and they told the victim that they would buy her a new pillow. The victim said she was roughly eleven or twelve years old when this occurred.

Another time on the dozer tracks in 2016, the Defendant "stuck his fingers inside [her.]" The victim said it "was a lot more pressure than just, you know, him trying to rub up on [her] and just touching [her]. He actually got them fully in." The victim struggled remembering how old she was during this incident but said that, because it was in 2016,

- 8 -

she would have been around ten or eleven years old. She explained that these incidents occurred roughly every day, and she only sometimes got "a day off."

During Thanksgiving of 2016, the Defendant retrieved the victim from the Defendant's parent's house. The victim remembered it being Thanksgiving because "it was like on a Wednesday[.]" She was not "for sure exactly, but [was] pretty sure it was a Wednesday." The State reminded the victim that Thanksgiving always fell on a Thursday, to which the victim acknowledged and again explained that she struggled remembering exact dates. The Defendant was driving his "little S-10" and told her to sit beside him in the middle of the vehicle rather than by the door. No one else was in the vehicle. The victim complied, and while the Defendant drove, he "stuck his hands down [her] pants and was rubbing up on [her] vagina." He told the victim not to tell anyone and to keep this their "little secret[.]"

In 2017, when the victim was around twelve or thirteen years old, her family got a pool. The victim loved spending time at the pool, but while by the pool, the children had to be accompanied by an adult. The Defendant typically supervised the children, as the victim's mother generally did not spend time at the pool. One day during that summer, the victim's brothers got in trouble for arguing and splashing in the pool and were sent inside. The victim remained by the pool because she loved swimming and did not want to go inside. According to the victim, the Defendant was not "in an awful mood" that day, but he, nonetheless, pulled her onto his lap, "again, rubbing and touching [her] vagina and trying to take [her] bikini off." The victim clarified that the Defendant was touching her underneath her bathing suit. While he attempted to take off her bikini top, he was unable to untie it because the victim had double-knotted it to keep it from falling off.

In 2019, the Defendant told the victim to help him clean the garage. Because the Defendant appeared to be in a good mood that day, the victim did not think much about helping him. When she went into the garage, the Defendant asked her to get an atlas, or some kind of book, from a shelf. As she climbed on a step stool with approximately three steps on it, the Defendant pinned her to the wall. The victim could not recall whether she was wearing shorts or pants that day, but the Defendant removed her bottoms and covered her face with them. He then pulled her to him and "stuck his penis inside [her]." When he pulled her down onto his penis, he "got it pretty far in, just not all the way completely in before [the victim's] mom walked in[.]" The victim then grabbed her clothes and ran inside the house. The victim described the Defendant's penis as different than "callousy" hands: "It was really wet, it was a lot more pressure. You could definitely tell what it was because it was like a completely different feeling. It wasn't callousy . . . [or] rough. It was just a lot bigger than a finger would be and a lot more pressure."

At first the victim said she did not believe the Defendant completely removed his pants during this incident because, while she could not see his pants due to her face being covered, she felt them. However, she agreed that in her forensic interview, she said his pants were down when she ran out of the garage. She also agreed that in her forensic interview, she never mentioned her mother walking in during this incident. When asked how old she was when this incident happened, the victim first said that she was around eleven or twelve years old, but she agreed that in her forensic interview, she had said she was eleven years old during this incident. However, she then clarified that she would likely have been around twelve or thirteen years of age. When asked again about her age in 2019, the victim agreed she would have been roughly thirteen or fourteen years old. She recalled the garage was put on the property when she was around thirteen years old and that she believed she would have been around thirteen or fourteen years old during this incident. The victim again emphasized that these "things" happened to her so many times that she struggled remembering the exact dates and her age at the times of the incidents.

Another time in 2019, the Defendant and the victim were sitting on the couch together. The Defendant asked the victim to "rub his belly[.]" However, instead of "just rubbing his belly, like he had a bellyache, he kept making [her] go lower and lower and lower until [she] was touching his penis." She described the Defendant's pushing her hand down with such force that she could not fight back. Once she was touching his penis, he made her "rub up and down but not like grab it or nothing, just kind of rub up and down on it." The Defendant's penis was "hard and weird feeling" and "wasn't like a hand[.]"

The last incident the victim could recall with detail happened around October 2020 on "donut day." The victim's mother left to pick up donuts for the family, and although the victim "begged" to accompany her mother, the victim was made to stay at home. Once the victim's mother left, the Defendant told the victim's brothers to play in their bedrooms. When her brothers did not want to, the Defendant made them leave the room. The Defendant then sat on the couch with the victim and the two started wrestling. At first the victim thought it was "normal wrestling," like her brothers did, but then the Defendant held her down, removed her pants, covered her face, and began "touching up on [her] and rubbing up on [her] vagina again." Afterwards, she collected her pants, ran to her bedroom, and locked the door. The victim said this incident happened around two weeks before she disclosed the abuse.

The victim acknowledged that for a period of time when she was younger, the Defendant got a good job and the abuse stopped. However, when his job began to bother him, he became more aggressive and "everything just started all over again." She then

noted that prior to her disclosure, her mother had taken away her cell phone. The victim threatened to disclose the abuse unless her mother returned her phone. Although her cell phone was returned, the victim still disclosed the abuse to her older brother, and they both told the victim's father. The victim explained that she still disclosed the abuse because she "needed out of the situation." She later wrote a letter apologizing to her mother and the Defendant for using blackmail to get her cell phone, which was entered as an exhibit. However, the victim emphasized that her letter was an apology regarding her use of blackmail but that she had not lied about the abuse. She affirmed that the letter contained no apology for lying. At the top the letter, it read, "Do not show to anyone else but [the Defendant] this is private." In relevant part, the letter stated, "I also should have never tried to blackmail you/[the Defendant]. It was wrong[,] and I'm so sorry to both of you for that. The reason I did that was because I was angry and upset with Dad[,] so I took the anger out on everyone else."

Ms. Miller with DCS testified similarly as she did at the motion to suppress hearing. She recalled the Defendant's mentioning in his interview that he sometimes wrestled with the victim and, during wrestling, may have unintentionally touched her in an inappropriate area. He indicated that the victim took this accidental touching "the wrong way." She agreed that the Defendant had never explicitly stated that he had touched the victim's vagina or breasts and that the Defendant mentioned having PTSD and needing medication. She noted that the Defendant made a written statement, which was entered into evidence and provided:

> I have really bad nerves I don't know if I'm coming or going a lot of times. I'm on . . . medicine and trying and hoping to get it under control. I know I've did stuff but I don't rem[em]ber. I need help cause I don't know what I'm doing ha[lf] the time. I don't know how to write down what I need to say.

Additionally, Sgt. Phillips testified as he did at the motion to suppress hearing and confirmed that he recorded the Defendant's interview with Ms. Miller. The recording of the twenty-six-minute interview was entered without objection.

The State rested, and the Defendant elected to testify. He denied ever sexually abusing the victim. When the victim was young, the Defendant worked until 5:00 or 6:00 p.m. and occasionally worked third shift. As such, for part of the year, it was dark outside when he returned home, and they could not have gone riding together on the trails. While he acknowledged that the family had a four-wheeler, he said it was a racing four-wheeler, was not red, and that he and the victim rarely rode alone together on it or the ranger. The

only times they were alone together on the four-wheeler or ranger were when he took the victim to his parents' house, which was a quarter of a mile down the road. He noted that if he started the four-wheeler at his house, it could be heard at his parents' house.

The Defendant stated that he liked to be by himself and that the garage was his place to "get away." As such, he never asked the victim to help him in the garage and noted there was no stepstool in the garage and the only books kept in there were for his truck. He also noted that, whenever the family was at the pool, the victim's mother was present. The Defendant was not told about the victim's disclosure to her mother at Long John Silver's but recalled a conversation about a "sparkly" pillow the victim wanted for her birthday or Christmas.

The Defendant stated he had been in the Army, had hurt his back and knee, and had PTSD. He acknowledged that he was a mechanic while in the Army and was never deployed. When asked how he received his injuries, he stated, "[from] different stuff . . . [he] encountered in the military." When asked about the correlation between his back pain and PTSD, he responded that he had "issues" in the military that he did not want to discuss. He said these issues affected how he acted toward his family.

The Defendant agreed that he had trouble with the victim over her refusing to follow the rules about wearing appropriate clothing. He admitted that he would lose his temper when the victim disobeyed the rules and that he "once or twice . . . slapped her on the butt" and told her to "put clothes on." The Defendant also wrestled with the children, including the victim. However, while he may have gotten too rough and touched her inappropriately when she was jumping on him, this touching was never intentional. The Defendant acknowledged that the boys never complained about the Defendant's hand accidentally going between their legs when wrestling, like the victim did. He also agreed with the State's comment that it was his "poor wrestling skills" that led him to get medicine and start going to church. The Defendant was aware that the victim had told her mother about this inappropriate touching, and when asked why the wrestling continued, the Defendant responded, "[W]hy did she come [b]ack wrestling?" The State clarified that the Defendant was the adult "in charge," to which he answered, "Correct."

While he was involved with the rules regarding the victim's clothing, the victim's mother handled the rules about the victim's phone use, and the victim's mother was strict on the victim's not being allowed to have a phone or social media. About one year prior to the victim's disclosure, the victim was caught with a cell phone, which her father said she had stolen. After this incident, the victim did not see her father for a year, but in

November 2020, the victim said she missed her father and went to his house. The next day the Defendant received a call from DCS asking him to meet for an interview.

During his interview with DCS, he was on anxiety medication, muscle relaxers, Gabapentin, blood pressure medication, and ibuprofen, and as a result, felt "pretty groggy[,]" tired, and "loopy." The officers' presence heightened his anxiety, and he did not understand that Ms. Miller was referring to sexual abuse during the interview. When he mentioned touching the victim "down there" he was referring to the "ongoing" problem of when the two wrestled together. When he mentioned needing help, he was referring to his anger and anxiety issues, again noting that he had PTSD. Regarding his conversation with the victim about his getting help and her walking around with her "[bum] hanging out," he was referring to the victim's not listening to him about her clothing, which triggered his anger. Once Ms. Miller mentioned semen, it "started clicking" what she was referring to, and he then "adamantly" denied sexually abusing the victim. He agreed that it did not make sense for the victim to lie on the stand regarding the allegations.

### 2. Jury Instructions

After the State's case-in-chief, the Defendant moved for an acquittal on all charges pursuant to Tennessee Rule of Criminal Procedure 29. Outside of the hearing of the jury, the trial court denied the motion as to counts 1 through 9. For counts 10 and 11, both charging sexual battery by an authority figure, the trial court found that the State charged the offense under an inapplicable subsection of the statute. The State requested the trial court charge the jury on the lesser included offense of "child abuse and neglect." The trial court reviewed the statute and stated,

> [W]hat we're looking at is [Code section] 39-15-401(b) which is any person who knowingly abuses or neglects a child under 18 years of age so as to adversely affect the child's health and welfare commits a Class A misdemeanor, because these offenses were not under the age of eight years old, otherwise, it would be an "E" felony.

The trial court found that the abuse was "clearly alleged in the proof for sexual battery[,]" and as to the adverse effect on the child's health and welfare, the victim was in therapy for "an extensive period of time[.]" The trial court agreed to instruct the jury on the lesser included offense of child abuse or neglect for counts 10 and 11 rather than dismissing both counts.

- 13 -

The trial court then noted that, while an election of offenses was not necessarily required, one would help the jury and prevent a unanimity problem. The trial court asked whether the State had an election prepared, which it did not. While the State agreed to work on the election for the jury instructions, the trial court commented to the parties, "[I]f you all can collaborate so that . . . you all agree that the brief description is the same incident, or it's not described in a way that's overly prejudicial, that would be great." After a recess, the trial court asked whether defense counsel had any objections to the proposed instructions, to which defense counsel did not. During the instructions, the trial court instructed the jury on the credibility of witnesses, the weight to be given their testimony, and on determining the weight of the other evidence. The trial court then informed the jury that the court had removed from the jury's considerations the charges of sexual battery by an authority figure for counts 10 and 11 and would instead instruct on the lesser included offense of "child abuse" for each count. In relevant part, the court defined counts 10 and 11 as follows:

> [A]ny person who commits the offense of child abuse is guilty of a crime. For you to find the defendant guilty of this offense, the State must have proven beyond a reasonable doubt the existence of the following essential elements: First, that the defendant knowingly abused or neglected a child under 18 years of age so as to adversely affect the child's health and welfare . . . .
>
> Child means a person under 18 years of age. To constitute neglect, the State must prove beyond a reasonable doubt that there was an actual adverse [e]ffect to the child's health and welfare. A mere risk of harm is not sufficient. Neglect is a continuing course of conduct beginning with the first act or omission that causes adverse effects to a child's health and welfare and can be an act of commission or omission.

Continuing its instructions, the trial court stated that its rulings, instructions, and other remarks did not indicate its opinion as to the facts or what the jury's verdict should be. As to the election instructions, the court stated,

> To ensure a unanimous verdict, the law requires the State to elect which alleged act testified to the State is relying upon for your consideration in deciding whether or not the defendant is guilty of this offense or any lesser included offense. The fact that the Court has required the State to elect does not mean that the Court has found that the State has carried its burden of

proving those allegations beyond a reasonable doubt. That is for your determination.

As to count one in this case, the State has elected to submit for your consideration the alleged act of sexual battery in or about the fall of 2010, where the [D]efendant . . . took [the victim], approximately five years old at the time, into the woods on a four-wheeler, removed her shorts and underwear and rubbed her on her vagina.

As to count two in this case, the State has elected to submit for your consideration the alleged act of aggravated sexual battery between January 1st and December 31st of 2013. The [D]efendant . . . took [the victim], approximately seven or eight years old at the time, to a building on the property on the four-wheeler, went inside and then left again on the four-wheeler before taking her to a separate location, removing her shorts and underwear and touching her on the vagina.

As to count three in this case, the State has elected to submit for your consideration the alleged act of rape of a child in or about the summer of 2016. [The Defendant] took [the victim] to what was referred to as the dozer tracks on the four-wheeler before removing her shorts and underwear and penetrating her vagina with his fingers. [The victim] was approximately 10 or 11 years old at the time.

As to count four in this case, the State has elected to submit for your consideration the alleged act of incest where [the Defendant] sexually penetrated [the victim] in the summer of 2016, during the incident described in count three by penetrating her vagina with his fingers and was her stepfather during that time. [The victim] was approximately 10 or 11 years old at the time.

As to count five in this case, the State has elected to submit for your consideration the alleged act of aggravated sexual battery where [the Defendant] in or about the summer of 2016, took [the victim] to the dozer tracks in a Ranger ATV and touched her vagina with his fingers while her head was pressed against the seat belt. [The victim] was approximately 10 or 11 at the time.

As to count six in this case, the State has elected to submit for your consideration the alleged act of sexual battery in November of 2016, where [the Defendant] took [the victim] up at his parents' house in his truck on Thanksgiving Day. While driving, [the Defendant] stuck his fingers inside her pants and touched her vagina. [The victim] was approximately 11 years old at the time.

As to count seven in this case, the State has elected to submit for your consideration the alleged act of aggravated sexual battery in the summer of 2017, where [the Defendant] put his hands inside the bathing suit bottoms of [the victim] while they were in the swimming pool and touched her vagina. [The victim] was approximately 11 or 12 years old at the time.

As to count eight in this case, the State has elected to submit for your consideration the alleged act of rape in the fall of 2019, where [the Defendant] sexually penetrated [the victim] in the garage on the family's property when he grabbed her and pulled her down to his penis, penetrating her vagina. [The victim] was approximately 13 or 14 at this time.

As to count nine in this case, the State has elected to submit for your consideration the alleged act of incest in the fall of 2019, where [the Defendant] sexually penetrated [the victim] in the manner described in count eight when he penetrated her vagina with his penis in the family garage, and [the victim] was known to be his stepdaughter. [The victim] was approximately 13 or 14 at the time.

As to count ten in this case, the State has elected to submit for your consideration the alleged act of child abuse sometime between January 1st and December 31st of 2019, where [the Defendant] had [the victim] rub his penis while sitting on the couch. [The victim] was approximately 13 or 14 at the time.

As to count 11 in this case, the State has elected to submit for your consideration the alleged act of child abuse in or about October, 2020, where [the Defendant] touched the vagina of [the victim] on the couch of the family home when her mother was picking up donuts. [The victim] was 15 at the time.

The trial court again instructed the jury to consider "only these alleged acts" when deciding whether the Defendant had been proven guilty beyond a reasonable doubt of the charged offenses. The jury found the Defendant guilty of all counts.

### C. Sentencing and Motion for New Trial

The Defendant was sentenced to an effective eighty-year sentence in confinement. In counts 10 and 11, he received concurrent terms of eleven months and twenty-nine days for the Class A misdemeanor offenses, and the judgment forms listed these convictions as "Child Abuse and Neglect." Following the sentencing hearing, new counsel was appointed for the Defendant, who filed a motion for new trial on the Defendant's behalf. The trial court denied the Defendant's motion after conducting a hearing.

This timely appeal followed.

## II. ANALYSIS

### A. Motion to Suppress and *Miranda* warnings

The Defendant argues that the trial court erred by denying his motion to suppress his recorded statements made at the DCS office because such statements were elicited pursuant to a custodial interrogation and prior to his receiving *Miranda* warnings. The State responds that the trial court properly denied the Defendant's motion to suppress because he was not in custody at the time of the DCS interview.

"No person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V. The Fifth Amendment privilege against self-incrimination is applicable in state prosecutions by virtue of incorporation through the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 6 (1964). Additionally, in Tennessee, "the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. In *Miranda v. Arizona*, the United States Supreme Court held that a suspect's statements made during a custodial police interrogation are inadmissible as substantive evidence at trial unless the suspect was advised of certain constitutional rights and waived those rights. 384 U.S. at 444; *State v. Anderson*, 937 S.W.2d 851, 853 (Tenn. 1996). As such, an in-custody suspect

> must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an

attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda*, 384 U.S. at 479.  The requirements outlined in *Miranda* "must be strictly enforced, but only in those situations in which the concerns that motivated the decision are implicated." *State v. Goss*, 995 S.W.2d 617, 629 (Tenn. Crim. App. 1998) (citing *Illinois v. Perkins*, 496 U.S. 292, 296 (1990)).  Thus, *Miranda* warnings are not required in every situation in which citizens encounter law enforcement officers.  *State v. Walton*, 41 S.W.3d 75, 82 (Tenn. 2001).  Rather, because "'[t]he underpinnings of *Miranda* are to dissipate the compulsion inherent in custodial interrogations, to prevent coerced self-incrimination, and to prevent relevant defendant ignorance,' the requirements of *Miranda* come into play only when the defendant is in custody and is subjected to questioning or its functional equivalent." *Id.* (first quoting *State v. Callahan,* 979 S.W.2d 577, 582 (Tenn.1998); then citing *Rhode Island v. Innis,* 446 U.S. 291 (1980)).  Absent either of these prerequisites, the requirements of *Miranda* are not implicated.  *Id.*

The *Miranda* court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his [or her] freedom of action in any significant way." *Miranda*, 382 U.S. at 444.  An interrogation "refers not only [to] express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit incriminating information." *Walton*, 41 S.W.3d at 83 (quoting *Innis*, 446 U.S. at 301).  "Included within this definition is any 'practice that the police should know is likely to evoke an incriminating response from a suspect.'" *Id.*  Regarding the issue of custody, our supreme court expanded upon the definition provided by the *Miranda* court and explained that a suspect was in custody when "under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest." *Anderson*, 937 S.W.2d at 855.  Factors relevant to this objective assessment include: the time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will. *Id.* The listed factors are not exclusive, and the totality of the circumstances surrounding each

interrogation must be "closely examined" to determine whether a suspect is in custody to trigger the *Miranda* safeguards. *Id.* As such assessment is "very fact specific[,]" our supreme court noted that trial courts are "especially suited" for applying the appropriate factors to the facts of the case. *Id.*

At a suppression hearing, "[q]uestions of [the] credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Therefore, we will uphold the trial court's findings of fact at a suppression hearing unless the evidence preponderates against them. *State v. Bell*, 429 S.W.3d 524, 528 (Tenn. 2014). The party prevailing in the trial court "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *Id*. at 529. The lower court's application of law to the facts is reviewed de novo with no presumption of correctness. *Walton*, 41 S.W.3d at 81. Moreover, an appellate court on review may consider the evidence presented at the suppression hearing as well as at trial in determining whether the trial court properly denied a pretrial motion to suppress. *State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998).

Here, we agree with the trial court that the Defendant was not subject to a custodial interrogation at the DCS office. While the interview took place on a Saturday evening in a building that was not then open to the public, the interview was not conducted on law enforcement premises. The Defendant voluntarily drove himself to the interview, and the duration of the interview prior to the Defendant's being *Mirandized* was not long, lasting approximately twenty-six minutes, with the Defendant admitting to touching the victim less than two minutes into the interview. The character of the questioning was not accusatorial but was polite, respectful, and conversational, with Ms. Miller occasionally apologizing for certain questions or delays, and the Defendant calmly responding, "Oh, you're fine." Initially, Ms. Miller inquired only as to whether there was a reason for a child abuse allegation without specifying the type of abuse allegation or otherwise presenting evidence of guilt. She then merely asked the Defendant to explain his responses. While two armed and uniformed officers were present, their presence was for safety reasons, they did not participate in the interview, they sat away from the table where the interview was conducted, and they had virtually no interaction with the Defendant until he was *Mirandized*. The Defendant was not restrained or locked inside the building and even acknowledged that he "didn't even have to be [t]here." *See State v. Phillips*, 30 S.W.3d 372, 376 (Tenn. Crim. App. 2000) (holding that the defendant was not in custody for *Miranda* purposes during his interview with DCS when he voluntarily came to the

interview and his freedom of movement was not deprived to a degree associated with a formal arrest).

Based upon our consideration of the above factors, we conclude that a reasonable person in the Defendant's position would not consider himself deprived of freedom of movement to a degree associated with a formal arrest, and as such, *Miranda* warnings were not required. *See Anderson*, 937 S.W.2d at 855. The Defendant is not entitled to relief.

### B. Election of Offenses in the Jury Charge

The Defendant contends that the trial court's incorporating the State's bill of particulars into its election instructions constituted an improper comment on the evidence. To this point, he argues that any modifiers included in the instructions, like "alleged act," were too far removed from the descriptions of the acts, and the descriptions were unnecessarily detailed and included "unclear" information such as dates of the offense and the victim's age at the times of the offenses. As such, he asserts that the resulting instructions presented the acts as established facts and not as mere allegations based upon the victim's testimony thereby crediting the State's proof. The Defendant additionally claims that he is entitled to plenary review of this issue because it was raised in his motion for new trial, or in the alternative, is entitled to plain error relief. The State responds that the Defendant is not entitled to any relief because the trial court's instructions did not constitute an improper comment on the evidence.

Article VI, section 9 of the Tennessee Constitution provides, "Judges shall not charge juries with respect to matters of fact, but may state the testimony and declare the law." The jury must decide the facts of the case under the supervision of the judge, and the judge must provide the law governing the parties without bias and without interfering in the jury's finding the facts. *Kanbi v. Sousa*, 26 S.W.3d 495, 498 (Tenn. Ct. App. 2000). Thus, "judges in Tennessee are prohibited by the state constitution from commenting upon the credibility of witnesses or upon the evidence in the case." *State v. Suttles*, 767 S.W.2d 403, 406 (Tenn. 1989). "[E]ven very slight indications of opinion on the part of the judge can have a powerful impact upon the minds of the jury." *Kanbi*, 26 S.W.3d at 498. In order to protect the jury's fact-finding role, the trial judge must be "very careful not to give the jury any impression as to his feelings" or "make any statement which might reflect upon the weight or credibility of evidence or which might sway the jury." *Suttles*, 767 S.W.2d at 407.

We first address the Defendant's contention that he is entitled to plenary review because he raised the issue in his motion for new trial. While it is true that "[a]n erroneous

or inaccurate jury charge, as opposed to an incomplete jury charge, may be raised for the first time in a motion for a new trial and is not waived by the failure to make a contemporaneous objection[,]" *see State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005) (citation omitted), the Defendant's waiver results for a different reason. Here, the trial court did not merely "copy[] and past[e]" the State's bill of particulars into its election instructions as the Defendant suggests. Rather the record shows that the trial court stated to the parties that an election of offenses would assist the jury in its deliberations. When the State agreed to work on an election for the jury instructions, the trial court requested that the parties "collaborate" and "agree that the brief description is the same incident, or it's not described in a way that's overly prejudicial[.]" After a recess, the trial court specifically asked defense counsel if he had any objections to the proposed instructions, which were identical to the State's bill of particulars, and defense counsel said that he did not. Defense counsel did more than just fail to contemporaneously object, he at least implicitly, if not explicitly, agreed to the propriety of the election of offenses as provided by the State. The Defendant invited the error of which he now complains. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). As such, he has waived plenary review of this issue and would be entitled to relief only under the plain error doctrine. *See, e.g.*, *State v. Jones*, 568 S.W.3d 101, 131 (Tenn. 2019) (concluding that defendant waived a jury instruction issue because "the [d]efendant did not object to this instruction and, in fact, appeared to be in agreement with the trial court's resolution of the issue"); *State v. Crocker*, 697 S.W.2d 362, 365 (Tenn. Crim. App. 1985) (concluding that defendant waived issue because "defense counsel interposed no objection to the trial court's actions regarding these matters [the jury instructions], and in fact, affirmatively agreed to them").

In conducting plain error review, our court will reverse for plain error only if the five following prerequisites are satisfied:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). All five factors must be present in the record before an appellate court will recognize the existence of plain error, and complete consideration

of all the factors is not necessary when it is clear from the record that at least one factor cannot be established. *Id*. at 283. In order to warrant plain error relief, the magnitude of the error must have been so significant "that it probably changed the outcome of the trial." *Adkisson*, 899 S.W.2d at 642 (quoting *United States v. Kerley*, 838 F.2d 932, 937 (7th Cir. 1988)). Plain error relief should be "sparingly exercised[,]" *see State v. Bledsoe*, 226 S.W.3d 349, 354 (Tenn. 2007), and is only appropriate for errors that are "especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding," *State v. Page*, 184 S.W.3d 223, 231 (Tenn. 2006). A defendant has the burden of persuading the appellate court that plain error exists. *Bledsoe*, 226 S.W.3d at 355.

In the case at bar, we conclude that no clear and unequivocal rule of law was breached. The Defendant does not cite any Tennessee authority that specifically addresses when, or in what regard, a trial court's election instructions—given to ensure that the jury is deliberating about a single instance of alleged criminal conduct—clearly and unequivocally constitute an impermissible comment on the evidence. And while this court has addressed a similar issue in the context of the jury charge in general, we are unaware of any Tennessee court that has addressed this precise issue as it pertains to the trial court's improper commentary on the election of offenses, making it one of first impression. *See State v. Fusco*, 404 S.W.3d 504, 532, 535-36 (Tenn. Crim. App. 2012) (declining to find a breach of a clear and unequivocal rule of law when the issue is a matter of first impression); *State v. Cody*, No. E2022-00947-CCA-R3-CD, 2023 WL 9006670, at *20 (Tenn. Crim. App. Dec. 28, 2023) (noting that a novel legal theory cannot be the basis for granting plain error relief); c*f. State v. Brewer*, No. W2012-02281-CCA-R3-CD, 2014 WL 1669807, at *13-15 (Tenn. Crim. App. Apr. 24, 2014) (addressing the defendants' issue of improper commentary on the evidence by the trial court's use of the word "victim" in the jury charge), *abrogated on other grounds by State v. Duncan*, 505 S.W.3d 480 (Tenn. 2016).

Moreover, the trial court here prefaced the election instruction with a statement that, although the court required the State to provide an election of offenses, the inclusion of such did "not mean that the court ha[d] found that the State ha[d] carried its burden of proving those allegations beyond a reasonable doubt[,]" as such was for their determination alone. When instructing the jury regarding the election for each specific instance of sexual abuse, the trial court informed the jury that it was "the State" making the election and introduced each act as an "alleged act." It also referred to these acts as allegations throughout its instructions. *Cf. Brewer*, 2014 WL 1669807, at *15 (concluding there existed no plain error within the trial court's inconsistent use of modifiers when describing the victim when viewed in the overall context of the jury charge). The trial court specified that it was the jury's duty to determine the value and weight of the evidence and the credibility of witnesses. *Cf. State v. Myrick*, No. W2008-02190-CCA-R3-CD, 2010 WL

2695542, at *11 (Tenn. Crim. App. July 7, 2010) (holding the trial court did not improperly comment on the evidence when, during a curative instruction, it noted that certain statements were admissible but that it was the jury's duty to determine the credibility and weight of the evidence). The trial court further informed the jury that neither the election instructions nor the general instructions constituted the court's comment or opinion on the evidence and that the determination of whether the State had met its burden was solely a matter for the jury. *See State v. Banks*, 271 S.W.3d 90, 137 (Tenn. 2008) (noting that a jury is presumed to follow the instructions of the trial court). As such, the Defendant is not entitled to relief under the plain error doctrine.

### C. Jury Instructions on Counts 10 and 11—Child Abuse or Neglect

The Defendant contends that the trial court's jury instruction in counts 10 and 11 for "child abuse" was an incorrect statement of law because the trial court did not require the jury to find that the victim suffered an injury pursuant to Tennessee Code Annotated section 39-15-401(a). To this point, the Defendant claims that the trial court intended to instruct on "child abuse" under subsection -401(a) because the trial court identified the offense as "child abuse," the Defendant was found guilty of "child abuse," and the Defendant was sentenced in accordance with subsection -401(a). However, he argues that the trial court mistakenly gave the instruction for "child neglect" pursuant to subsection -401(b), a separate and distinct offense that does not include an injury element. The State concedes that the trial court mislabeled the offense in its instructions but argues that any such error is harmless because the court intended to, and did, instruct the jury on subsection -401(b), an offense that does not require an injury.

The United States Constitution and the Tennessee Constitution guarantee a right to trial by jury. U.S. Const. amend. VI; Tenn. Const. art. I, § 6. "This right encompasses an entitlement to 'a complete and correct charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions.'" *State v. Fayne*, 451 S.W.3d 362, 373 (Tenn. 2014) (quoting *State v. Dorantes*, 331 S.W.3d 370, 390 (Tenn. 2011)). The trial court is tasked with providing this "complete charge" to the jury. *State v. James*, 315 S.W.3d 440, 446 (Tenn. 2010) (quoting *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986)). The jury instructions must correctly, fully, and fairly set forth the applicable law. *State v. Brooks*, 277 S.W.3d 407, 412 (Tenn. Crim. App. 2008). The instructions must be reviewed in their entirety rather than examining individual phrases in isolation. *Id*. Because challenges to a trial court's jury instructions are a mixed question of law and fact, our review is de novo with no presumption of correctness. *Fayne*, 451 S.W.3d at 373.

Tennessee Code Annotated section 39-15-401 outlines the offenses of child abuse and child neglect or endangerment. Tenn. Code Ann. § 39-15-401(a)-(c) (2025). To adequately address the Defendant's issue, a historical review of the various statutory versions of this offense is in order.

First, prior to 2005, the relevant part of the statute read,

Any person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury or neglects such a child so as to adversely affect the child's health and welfare commits a Class A misdemeanor; provided, however, that if the abused or neglected child is six (6) years of age or less, the penalty is a Class D felony.

Tenn. Code Ann. § 39-15-401(a) (2003). In construing this former statute, our supreme court provided that the offense of child abuse and neglect as proscribed was a single offense committed through one of two courses of conduct: child abuse through injury or child abuse through neglect so that the child's health and welfare were adversely affected. *State v. Mateyko*, 53 S.W.3d 666, 668 n.1 (Tenn. 2001) (citing *State v. Hodges*, 7 S.W.3d 609, 622-23 (Tenn. Crim. App. 1998)). While both courses of conduct fell under the general umbrella of "child abuse," *see Hodges*, 7 S.W.3d at 622, courts often referred to these two distinct courses of conduct simply as "abuse" and "neglect." *See, e.g.*, *State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000) (noting this statute could be broken down into two classifications: abuse and neglect); *Mateyko*, 53 S.W.3d at 668 n.1 (referring to the neglect prong of the statute as "child neglect" for ease of reference while noting the existing criminal code did not contain an offense labeled "child neglect"). When using these references, "child abuse" required that a person knowingly treat a child under eighteen years of age in a manner that inflicted an injury. *Ducker*, 27 S.W.3d at 896. "Child neglect" required that a person knowingly neglect a child under eighteen years of age so that the child's health and welfare were adversely affected. *Id.*

However, in *Dorantes*, the court reviewed a 1998 amendment to the first degree murder statute that enumerated aggravated child neglect in addition to aggravated child abuse as predicate felony offenses sufficient to support a felony murder conviction. *See* 331 S.W.3d at 381-85, 383 n.13; 1998 Tenn. Pub. Acts, ch. 1040, § 3.[4] The court noted that this amendment, coupled with a contemporaneous amendment to the aggravated child abuse and neglect statute, established aggravated child abuse as a separate offense from aggravated child neglect. *Dorantes*, 331 S.W.3d 370 at 385 n.15; 1998 Tenn. Pub. Acts, ch. 1040, § 1. The *Dorantes* court indicated that these amendments evidenced the

---

[4] Although decided in 2011, *Dorantes* involved the law in effect after the 1998 amendment.

legislature's intent to distinguish criminal conduct that caused injury to a child from criminal conduct that adversely affected a child's health and welfare in order to create two distinct offenses: child abuse and child neglect. *See Dorantes*, 331 S.W.3d 370 at 383-85, 383 n.13, 385 n.15.

In 2005, the legislature amended the child abuse statute and moved the result-of-conduct elements—injury on one hand, and an adverse effect on the child's health and welfare on the other—to separate subsections. *See* 2005 Tenn. Pub. Acts, ch. 487, § 1. A similar version was in effect at the time of the Defendant's offenses, which read,

> **39-15-401.  Child abuse and child neglect or endangerment.**
>
> (a) Any person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury commits a Class A misdemeanor; provided, however, that, if the abused child is eight (8) years of age or less, the penalty is a Class D felony.
>
> (b) Any person who knowingly abuses or neglects a child under eighteen (18) years of age, so as to adversely affect the child's health and welfare, commits a Class A misdemeanor; provided, that, if the abused or neglected child is eight (8) years of age or less, the penalty is a Class E felony.

Tenn. Code Ann. § 39-15-401(a)-(b) (2018 & Supp. 2019). Notably, and unlike the prior version of the statute, the legislature explicitly stated that conduct which results in an adverse effect to a child's health and welfare in subsection -401(b) may be predicated upon "abuse[] or neglect[,]" not merely neglect. *Id.*; *see State v. Dewitt*, No. M2015-00816-CCA-R3-CD, 2016 WL 6638857, at *7 (Tenn. Crim. App. Nov. 10, 2016) (providing that the statute "defines child neglect as including abuse"); *State v. Hidalgo*, No. M2011-01314-CCA-R3-CD, 2013 WL 1197726, at *11 (Tenn. Crim. App. Mar. 26, 2013) (noting that subsection -401(b) refers to abuse or neglect as alternative bases for adversely affecting the child's health and welfare; thus, the statute defines child neglect as including abuse). The legislature's use of the word "or" here is significant because the word "or" is disjunctive, typically indicating an alternative between two or more options. *See Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 87 (2018).

Turning to the Defendant's argument, we first note that the Defendant failed to lodge a contemporaneous objection to the jury instructions pertaining to this offense. However, as noted above, "[a]n erroneous or inaccurate jury charge, as opposed to an incomplete jury charge, may be raised for the first time in a motion for a new trial and is

not waived by the failure to make a contemporaneous objection." *Faulkner*, 154 S.W.3d at 58 (citing *State v. Lynn*, 924 S.W.2d 892, 898-99 (Tenn. 1996)); *see also* Tenn. R. Crim. P. 30(b). As the Defendant raised the accuracy of this instruction in his motion for new trial, we proceed with plenary review.

Here, the record is clear that the trial court intended to instruct the jury on subsection -401(b), the offense requiring an adverse effect on the child's health and welfare. Count 10 involved the Defendant's forcing the victim to rub his penis while the two were sitting on the couch and count 11 involved the Defendant's holding down the victim while they were wrestling, covering her face, and touching and rubbing her vagina. After reviewing the law on whether to proceed on the lesser included offenses, the trial court expressly stated that "what we're looking at is [Code section] 39-15-401(b)." The trial court went on to recite the language of subsection -401(b) and found that "abuse" was alleged by the proof of sexual battery and that the victim's attending therapy for an "extensive period of time" showed that such conduct caused an adverse effect on her health and welfare. As discussed above, subsection -401(b) lists either abuse or neglect as alternative conduct sufficient to warrant conviction under this subsection, and the "abuse" conduct does not require a resulting injury in this instance, only a resulting adverse effect on the child's health and welfare. *See* Tenn. Code Ann. § 39-15-401(b); *cf. Dewitt*, 2016 WL 6638857, at *7; *Hidalgo*, 2013 WL 1197726, at *11. As to the Defendant's argument that he was sentenced in accordance with subsection -401(a) in counts 10 and 11, we note that at the time of his offenses, both subsections -401(a)-(b) classified offenses committed against victims over eight years of age as Class A misdemeanors. *See* Tenn. Code Ann. § 39-15-401(a)-(b) (2018 & Supp. 2019). As such, the Defendant's Class A misdemeanor sentences in these counts do not support his argument that the trial court intended to instruct the jury on subsection -401(a).

Additionally, the Defendant's reliance on *State v. Walkington*, No. M2019-01772-CCA-R3-CD, 2020 WL 6791248 (Tenn. Crim. App. Nov. 19, 2020) is misplaced. In *Walkington*, the victim was eight years of age or younger, which was punished as a Class D felony under subsection -401(a) and a Class E felony under subsection -401(b). Tenn. Code Ann. § 39-15-401 (a)-(b) (2014); *Walkington*, 2020 WL 6791248, at *5, *7. The *Walkington* court found that the trial court intended to instruct on subsection -401(a) and sentenced the defendant under this subsection but mistakenly instructed the jury on the elements of subsection -401(b). *Walkington*, 2020 WL 6791248, at *4-7. As explained, such is not the case here. Moreover, the *Walkington* court's analysis did not address the abuse conduct included in subsection -401(b). *See id.* Accordingly, as the trial court in the present case did not include an injury element in its instructions for counts 10 and 11, and the Defendant received two identical Class A misdemeanor sentences, s*ee* Tenn. Code

Ann. § 39-15-401(a)-(b) (2018 & Supp. 2019), it did not provide an incorrect statement of law.

Lastly, we are not required to accept the State's concession that the trial court erred by referring to this offense as "child abuse" in its instructions. *See State v. Brown*, 479 S.W.3d 200, 210 (Tenn. 2015) (noting courts are not required to accept the State's concession). While courts commonly refer to this subsection as the "child neglect" statute—perhaps a colloquial remnant of the pre-2005 neglect prong of the child abuse statute—the term "abuse" is expressly included in the current and relevant version of subsection -401(b). *See State v. Ortiz*, No. M2016-02457-CCA-R3-CD, 2018 WL 3738402, at *9 (Tenn. Crim. App. Aug. 6, 2018) (affirming conviction for "child abuse" pursuant to subsection -401(b)). As such, the Defendant is not entitled to relief.

### D.    Sufficiency of the Evidence

The Defendant asserts that the evidence was insufficient to support his convictions in counts 10 and 11 for both "child abuse" pursuant to Tennessee Code Annotated section 39-15-401(a) and "child neglect" pursuant to subsection -401(b). Related to his above argument, he contends the evidence was insufficient to support a conviction for "child abuse" under subsection -401(a) because the jury was not instructed on this offense and because the victim did not testify to suffering an injury resulting from these incidents. He next argues that the evidence was insufficient to support a conviction for "child neglect" under subsection -401(b) because no "actual, deleterious effect or harm upon the child's health and welfare" was testified to, and these incidents did not involve acts of neglect because they did not constitute a failure to act or a deprivation of care. The State responds that the evidence was sufficient to support a conviction pursuant to subsection -401(b).

The United States Constitution prohibits the states from depriving "any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1. A state shall not deprive a criminal defendant of his liberty "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). In determining whether a state has met this burden following a finding of guilt, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Because a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, the defendant has the burden on appeal of illustrating why the evidence is insufficient to support the jury's verdict. *State v. Tuggle*,

639 S.W.2d 913, 914 (Tenn. 1982). If a convicted defendant makes this showing, the finding of guilt shall be set aside. Tenn. R. App. P. 13(e).

"Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). Appellate courts do not "reweigh or reevaluate the evidence." *Id*. (citing *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978)). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Therefore, on appellate review, "the State is entitled to the strongest legitimate view of the trial evidence and all reasonable or legitimate inferences which may be drawn therefrom." *Cabbage*, 571 S.W.2d at 835.

We first note our previous conclusion that the Defendant was not convicted pursuant to subsection -401(a). Accordingly, we will focus our analysis on his conviction pursuant to subsection -401(b). As discussed above and as relevant to this case, it is a criminal offense for a person to knowingly abuse or neglect a child under eighteen years of age so as to adversely affect the child's health and welfare. Tenn. Code Ann. § 39-15-401(b) (2018 & Supp. 2019). Abuse of a child pursuant to this subsection includes acts of sexual abuse. *See id.* -401(f) (2018 & Supp. 2019) (noting that a violation of this section may be a lesser included offense of a sexual offense if the victim is a child and the evidence supports a charge under this section); *Ortiz*, 2018 WL 3738402, at *9 (affirming conviction for abuse of a child under subsection -401(b) when the defendant sexually abused the victim). A person acts knowingly "with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist" or a person "acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." *Id.* § 39-11-302(b). Additionally, something more than a risk of harm to a child's health and welfare must be established before a conviction can stand. *See Mateyko*, 53 S.W.3d at 671 (interpreting the neglect prong of the pre-2005 version of the statute). Rather "an actual, deleterious effect or harm upon the child's health and welfare" is required. *Id.* at 672. A defendant may be held criminally liable despite his or her ignorance that his or her conduct produced any adverse effects to the child's health and welfare. *See Ducker*, 27 S.W.3d at 897.

Here, we agree with the Defendant that his acts do not constitute neglecting the victim in that he failed to act or that he deprived her of care. However, the evidence in the light most favorable to the State reflects that the Defendant knowingly *abused* the victim by forcing her to rub his penis, as reflected in count 10, and then by holding the victim

- 28 -

down, covering her face, and touching and rubbing her vagina, as stated in count 11. *See* Tenn. Code Ann. § 39-15-401(b); *Ortiz*, 2018 WL 3738402, at *9 (holding that the evidence was sufficient to support a child abuse conviction pursuant to subsection -401(b) when the defendant pushed the victim onto a bed, gave her "hickies" on her neck, and pulled down her pants and touched her "front private area"). The victim testified that both incidents occurred prior to her turning eighteen years old. *See* Tenn. Code Ann. § 39-15-401(b).

The Defendant's sexual abuse of the victim lasted a decade, beginning when the victim was three years of age. The victim additionally testified that fear prevented her from talking to anyone about the abuse and discouraged her from resisting the abuse because such resistance caused the Defendant to "hurt" her and make the abuse worse and last longer. Despite this, she disclosed the abuse shortly after the wrestling incident in count 11 because she needed to get "out of the situation." Due to the abuse, including the incidents in counts 10 and 11, the victim underwent nearly two years of therapy, sometimes going as often as twice a week. As such, we conclude a reasonable juror could have found the victim suffered more than a mere risk of harm from the abuse but suffered an actual, deleterious effect or harm to her health and welfare. *See Mateyko*, 53 S.W.3d at 671; *cf. State v. Frazier*, No. W2024-00396-CCA-R3-CD, 2025 WL 1464152, at *13 (Tenn. Crim. App. May 21, 2025), *perm. app. denied* (Oct. 9, 2025) (noting that the evidence was sufficient to show the defendant's conduct produced an actual, deleterious effect or harm upon the six-year-old's victim's health and welfare when the defendant, the victim's mother, left her alone with the codefendant, despite the fact that there had been previous allegations of abuse, and the victim indicated that she did not get upset when the codefendant touched her because he did not like it when she cried); *State v. Brown*, No. M2020-01721-CCA-R3-CD, 2022 WL 774745, at *5 (Tenn. Crim. App. Mar. 15, 2022) (concluding sufficient evidence of an adverse effect on the victim's health and welfare was presented when the nine-year-old victim had been raped multiple times by a known sex offender and the victim's mother sanctioned the conduct and allowed it to continue).

### III. CONCLUSION

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

s/ Kyle A. Hixson
KYLE A. HIXSON, JUDGE

- 29 -